IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| UNITED STATES OF AMERICA, | ) | 4:06CR3089 |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| CLAY LAMAR PERRY, | ) | |
| Defendant. | ) | |

Clay Lamar Perry ("Perry") was identified as the man who robbed a bank by four bank employees who viewed a photographic lineup. Perry seeks to suppress these identifications. This matter is before the court on the Magistrate Judge's Recommendation that Perry's motion to suppress (filing 17) be denied. The reasons for the recommendation were stated at the conclusion of the suppression hearing (filing 26, Tr. at 97-100, hereinafter "Tr. at __"), and a very brief order was entered, stating that a recommendation to deny the motion to suppress was made for the reasons stated on the record (filing 25). Perry has objected to the Recommendation (filing 27) pursuant to 28 U.S.C. § 636(b)(1)(C) and NECrimR 57.3.

After a de novo review of the Magistrate Judge's Recommendation pursuant to 28 U.S.C. § 636(b)(1) and NECrimR 57.3, I conclude that the Magistrate Judge's Recommendation should be adopted, the objection (filing 27) to the Recommendation should be denied, and the motion to suppress (filing 17) should be denied. As the Recommendation was made orally, I will summarize the facts and briefly explain the reasons for denying the motion to suppress.

## I. FACTS

On February 22, 2006, a man robbed a branch of the Bank of the West in Lincoln, Nebraska. The bank had four teller windows, each immediately adjacent to each other, as well as a drive-through window. Four tellers were working at the time of the robbery. Kris Bloomquist was in teller window number two. Amanda Parde was working at teller window number three. Laurie Christiansen was working at teller window number four. Neil Wortmann was working the drive-through window. A man entered the bank during daytime business hours and approached teller window three (Parde's window). (Tr. 6-7.)

When Wortmann heard the teller at window three (Parde) say "we'll be with you in just a minute," which was a signal for the drive-through tellers to assist the line tellers, Wortmann turned from the drive-through window. (Tr. 7.) Parde was then working with Bloomquist and Bloomquist's customer at teller window two (Bloomquist's window, adjacent to Parde's teller window). (Tr. 7.) Wortmann told the man at teller window three that he could help the man, at teller window one. (Tr. 8.) At that point, the man walked around the customer at teller window two, leaned in towards Wortmann at window one, and told Wortmann to give him all his money and that he had a gun. (Tr. 8.) Wortmann pointed to the drive-through window, indicated the money was there, and took two steps toward the drive-through window. (Tr. 8.) The man then told Wortmann to stay there, pointed to Parde, and asked for her money. Wortmann reached over, tapped Parde on the shoulder, and told her to give the man her money. (Tr. 8.) In the meantime, the man walked around to Parde's teller window, the third window. (Tr. 9.) Parde emptied the teller three cash drawer, and the man grabbed the money and stuffed it into his coat. Once Parde's drawer was empty, the man jumped up on the counter, pointed to Bloomquist's cash drawer in teller window two and asked for the money in Bloomquist's drawer. (Tr. 9-10.) The man, while on the counter, was reaching to grab the money as Parde was handing it over to him. (Tr. 10.) It was daylight, and all bank interior lights were working. (Tr.

10.) During this time, the robber was from two to five feet away from Wortmann. (Tr. 10-11.) The time elapsed from when Wortmann first saw the robber to the time the robber turned away from Wortmann to exit the bank was five to ten minutes. (Tr. 11.) Wortmann never saw a weapon. (Tr. 11.)

Police immediately responded and Wortmann gave investigating officers a physical description of the robber. (Tr. 12.) Later on the day of the robbery, Wortmann saw photographs taken from bank surveillance cameras. (Tr. 12.) On June 22, 2006, Wortmann was shown a photographic lineup. (Tr. 14.) He was asked to view six photographs, one at a time, and to indicate if he recognized any of the individuals, where he recognized the person from, and, if he recognized the person responsible for the bank robbery under investigation, to indicate how sure he was. (Tr. 15 & Ex. 4.)[1] The first time through the photographs, Wortmann recognized the second photograph and said "that's the gentleman." (Tr. 17.) He had at that point seen only two photographs. He viewed the other four photographs, then went through all six photographs again. He wrote on the second photograph that he was ninety-nine percent sure of his identification. (Tr. 17 & Ex. 4.) Perry's photograph was that identified by Wortmann. All photographs that Wortmann was shown, either in the photographic lineup or from the bank surveillance cameras, were black and white. (Tr. 14,18.)

Bloomquist's account of the robbery was consistent with Wortmann's. She was at her window (teller window two) working with a customer who had a problem with her account. She was reviewing account information on her computer screen. Parde, the teller at the adjacent window, had pulled up another computer program with customer information on her computer at window three. Bloomquist and Parde were together trying to help the customer understand how she had overdrawn her

---

[1]All exhibits cited were exhibits introduced at the hearing on the motion to suppress, and are cited as "Ex.__".

account. (Tr. 40.)[2] Wortmann's interruption of their conversation was very unusual because tellers were trained to interrupt transactions of other tellers only in an emergency. (Tr. 42.) Two to three minutes elapsed from the time Bloomquist first saw the robber at Parde's window until he left the bank. (Tr. 44.) The robber was between three and six feet away from her. (Tr. 45.) Bloomquist was working at that same bank branch five months earlier when it was robbed. (Tr. 46.) Bloomquist quickly realized it was another robbery, and she looked at the robber and watched him receive money from Parde. She did not see a gun. (Tr. 43, 46.)

Bloomquist had experience looking at photographic lineups of bank robbery suspects. After the bank robbery which occurred five months before the robbery in question, she was shown a photographic lineup on two separate occasions. During investigation of the prior robbery, Bloomquist did not identify anyone in the first lineup she was shown. She identified the robber in that earlier burglary in the second photographic display. (Tr. 46.)

Like Wortmann, Bloomquist was shown the collection of photographs one at a time. She identified the second photograph (which was Perry) as that of the robber, stating she was 99.99% sure. (Tr. 48-49.) At the time of the robbery, Bloomquist had identified the robber as Hispanic because she thought he looked like Cheech Marin. (Tr. 51.) She had no conversation with the other robbery witnesses about the photographic lineup. (Tr. 52.)

---

[2] Though not necessary to resolution of the motion to suppress, I note Bloomquist's succinct and common-sense explanation of the customer's problem: "[W]e . . . were trying to help this customer figure out her account. She was overdrawn and they always ask, well, why am I overdrawn, well, 'cause you spent too much money,' but we're trying to help her figure out where she spent the money." (Tr. 41:18-22.) If only everyone had Bloomquist's understanding of economics.

-4-

Parde's testimony about the robbery corroborated Wortmann's account. She estimated that she saw the robber for two to five minutes, from the time she first saw the robber to when he turned his back to leave the bank. (Tr. 28.). She was a little less than three feet away from the robber when he jumped up on the counter, and was otherwise about three feet away from him. (Tr. 30-31.) She also viewed a photographic lineup four months after the robbery, and identified Perry's photograph. She was seventy-five percent sure of her identification. (Tr. 32-33 & Ex. 5.) She stated that she thought she could recognize the robber if she saw him again, based on her observations of the robbery and her recollection of the photograph from the bank surveillance camera. (Tr. 35.) She explained that during the robbery she was too nervous to pay attention to what the robber looked like, but recalled the robbery when she saw the bank surveillance camera photographs. (Tr. 35.) Parde testified that it did not seem to her that "the officer showing [her] the photographic lineup was doing anything to try to get [her] to pick one picture over the others." (Tr. 36:8-9.)

Christiansen, the teller at window four, stated that she "spent quite a bit of time watching it [the robbery] unfold since I wasn't actively being robbed, so I had the opportunity to take in a lot of detail at the time of the incident." (Tr. 64: 16-19.) Like the other tellers, she was shown the bank surveillance photos a day or two after the robbery, and saw the photographic lineup four months after the robbery. All of the photographs were black and white. (Tr. 62, 65.) At the time she identified the photograph of Perry as that of the robber, she said she was ninety percent sure of her identification, as the robber was wearing a hat and do-rag at the time of the robbery and Perry was not wearing either in the photograph she identified. (Tr. 64.)

Officer Luke Wilke of the Lincoln Police Department was one of the officers who investigated the bank robbery. Wilke put together the photographic lineup shown to the witnesses to the robbery. (Tr. 70.) At the time, he had written transcriptions of the oral descriptions of the robber given shortly after the robbery. (Tr. 68.) The descriptions given by the witnesses were fairly consistent. Christiansen

described a Hispanic male, 5'6" to 5'8"tall, 160 pounds, early thirties in age, with a moustache, and wearing a black bandanna and a solid color light tan or green jacket. Wortmann described a Hispanic male, 5'7" to 5'8" tall, 150 to 160 pounds, low to mid thirties in age. Bloomquist described a Hispanic male, slight build, 5'7" to 5'9" tall, 150 to 170 pounds, early to mid thirties. Parde described the robber as being either a Hispanic male or a light-skinned black male, 5'7" to 5'8" tall, weighing 180 to 200 pounds. (Tr. 68-69.)

Perry did not become a suspect until more than three months but less than four months after the robbery. (Tr. 69.) Once he became a suspect, Wilke prepared a photographic lineup. Wilke had met Perry, and knew that he was a suspect and was a light-skinned black male. (Tr. 70, 76.) The United States Marshals list Perry as a 5'6" tall black male weighing 150 pounds, with black hair and brown eyes. (Tr. 70.) Wilke used a computer program to develop the photographic lineup. Wilke looked for photographs of other males of the same race, approximately the same age, who generally looked like Perry. As Perry had facial hair in his picture, Wilke considered only photographs of black men with moustaches. (Tr. 71.) These search parameters were put into a computer, and a program gave him dozens or hundreds of pictures to choose from. He selected five photographs in addition to Perry's, and the computer program assigned an order (with Perry's photo the second in the group). (Tr. 71-72, 86.)

Wilke had received training in putting photographic lineups together. He was taught that the individuals in the photographs should be of the same race, with similar physical features and of a similar age. (Tr. 76-77.) Based on his past experiences, he believed that the other men in the photographic array had to be of the same race as the suspect, whom he knew to be black. (Tr. 81-82.)

The photographic lineups showed to the witnesses were introduced into evidence. (Ex.'s 4 -7.) Those exhibits were "second generation" photographs, that

is, they were photocopies of the array shown to the witnesses. Exhibit 8 shows the photographs exactly as they were shown to the witnesses. (Tr. 74-75.) In exhibit 8, the men have very similar skin tones. The photographs were all the same size (that is, approximately 5" x 7"), but the photograph of Perry was taken at closer range and his face appeared larger than those in the other photographs.

## II. THE RECOMMENDATION

The Magistrate Judge found that the lineup was suggestive because Perry's photograph was taken at a closer range than the others, but found that under the totality of the circumstances there was no substantial likelihood of misidentification. He found that each of the witnesses had ample opportunity to view the robber in business lighting conditions in the middle of the day and at close range. All witnesses other that Ms. Parde were giving the robber their undivided attention. The witnesses who identified the defendant were quick and certain when they identified the photograph of the defendant. The level of certainty was very high (99.9%, 99%, 90% & 75%). The four month delay between the crime and the presentation of the photo array did not render the photographic identifications unreliable. The descriptions of the robber given shortly after the robbery were consistent.

Perry objects to the finding that the lineup did not create a substantial likelihood of misidentification. He asserts that identifications from the lineup must be suppressed because Perry had the lightest skin tone and was the only subject wearing jail clothes, and because none of the men included were Hispanic despite the fact that three of four witnesses had described the robber as Hispanic.

## III. DISCUSSION

A photographic identification by a witness must be suppressed only if the procedure employed was "impermissibly suggestive," and if "under the totality of the

circumstances, the suggestive procedures created a very substantial likelihood of irreparable misidentification." United States v. Triplett, 104 F.3d 1074, 1079 (8th Cir. 1997) (quoting United States v. Ramsey, 999 F.2d 348, 349 (8th Cir. 1993) and citing Manson v. Brathwaite, 432 U.S. 98 (1977)). As the Supreme Court emphasized in Brathwaite,

> reliability is the linchpin in determining the admissibility of identification testimony. . . . . The factors to be considered . . . include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

432 U.S. at 114.

I assume for purposes of this motion that the Magistrate Judge was correct in finding the photographic lineup suggestive, and turn to the question whether there was a "very substantial likelihood of irreparable misidentification." I agree with Magistrate Judge Piester that under the totality of the circumstances, and for the reasons he stated, there was no likelihood of misidentification. I briefly address Perry's arguments on appeal.

I reject Perry's argument that the lineup was unreliable because it included only black men, although most witnesses described the robber as Hispanic. Perry is black, and it was appropriate for the photographic display to include individuals who are black. Salam v. Lockhart, 874 F.2d 525, 529 (8th Cir. 1989) (finding photographic display and lineup not suggestive as "[t]he individuals in the photographic display and lineup were of the same race, possessed similar physical features, and were alike in size, age, and dress"). Though technically inaccurate as applied to Perry, the witness descriptions of an Hispanic robber are <u>not</u> so flawed as to indicate the

likelihood of misidentification in the photographic lineup. Viewing Perry's photograph, I find that he could be described as Hispanic by someone who only saw him when he was wearing a hat.

I similarly reject the argument that the photographic lineup was impermissibly suggestive because Perry had the lightest skin of any of the men included. The range of skin colors in the lineup was minor, and minor skin color differences are not of great importance when the photographs are in black and white. United States v. Marchand, 564 F.2d 983, 995 (2nd Cir. 1977).

Regarding Perry's "jail clothes" argument, it is factually unclear what Perry was wearing in the photograph included in the lineup. The record indicates that he could have been wearing jail clothes or hospital scrubs. (Tr. 87 (Perry's attorney argues that he was wearing jail clothes), Tr. 92-93 (counsel for the government asserts he may have been wearing hospital scrubs).) I find that even if Perry was photographed in jail clothes, given that the photograph was black and white, and considering the other indicia of reliability discussed above, Perry's clothing was not likely to overwhelm the witnesses' perception.

I specifically note that Bloomquist, the witness who was 99.9% sure of her identification, had every reason to pay close attention to the robber during the robbery. She had been working at the same bank branch when it was robbed five months earlier and had viewed two photographic lineups in connection with that prior robbery.

Accordingly,

IT IS ORDERED:

1. The Magistrate Judge's Recommendation (filing 25) is adopted;

2. Defendant's objections to the Recommendation (filing 27) are denied; and

3. Defendant's motion to suppress (filing 17) is denied.

September 20, 2006.　　　　　　　　BY THE COURT:

　　　　　　　　　　　　　　　　　　*s/Richard G. Kopf*
　　　　　　　　　　　　　　　　　　United States District Judge